ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

MAR 1 5 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| KODIAK PRODUCTS CO., INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:03-CV-1474-Y |
| | § | |
| TIE DOWN, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## <u>PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

PRELIMINARY STATEMENT .................................................................................. 1

PRELIMINARY INJUNCTION EVIDENCE ........................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

   A.  Kodiak's Trade Dress ........................................................................................ 2

   B.  Tie Down's Infringing Use of Kodiak's Trade Dress....................................... 4

ARGUMENT.................................................................................................................. 8

   Kodiak Is Entitled To a Preliminary Injunction Enjoining Tie Down's Use of Kodiak's
   Protected Trade Dress .......................................................................................... 8

      A. Kodiak Has A Substantial Likelihood Of Prevailing On Its Trade Dress
          Infringement Claim.............................................................................................9

         1. The Kodiak 225 Qualifies For Protection Because Aspects Of Its Design Are
            Nonfunctional And Have Acquired Secondary Meaning ........................................9

           a. Kodiak's Trade Dress Is Nonfunctional..............................................................9

              (i) Kodiak's Trade Dress is Non-Functional Under the Traditional Test.......10

              (ii) Kodiak's Trade Dress Is Non-Functional Under the Competitive
                  Necessity Test .....................................................................................16

           b. The Design of the Kodiak 225 Has Acquired Secondary Meaning..................17

         2. A Strong Likelihood of Confusion Arises From Tie Down's Sale of a
            Copy of Kodiak's Brake Caliper......................................................................19

      B. Kodiak Will Suffer Irreparable Injury If The Injunctive Relief Sought Is Not
          Granted..............................................................................................................21

      C. The Potential Harm To Tie Down If The Injunction Is Granted Is Minimal
          Compared To The Harm Kodiak Will Suffer From Tie Down's Infringing Use
          of Kodiak's Dress. ...........................................................................................22

      D. An Injunction Will Not Disserve The Public Interest. .................................22

   CONCLUSION............................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**

*Allied Mktg. Group, Inc. v. CDL Mktg. Group*, 878 F.2d 806 (5th Cir. 1989)................................ 9

*American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n*, 532 F. Supp. 1376
    (S.D. Tex. 1982), *judgment aff'd* 701 F.2d 408 (5th Cir. 1983)................................ 23

*Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) ........................................ 20

*Artemide Spa v. Grandlite Design & Mfg. Co.*, 672 F. Supp. 698 (S.D.N.Y. 1989) .................... 18

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1988)........................................ 15

*Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974) ........................................ 9

*Coach, Inc. v. We Care Trading Co.*, 2002 U.S. App. LEXIS 28143 (2d Cir. May 20, 2002)[1]... 11

*Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002)........ 9, 10, 11, 16

*Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336 (5th Cir. 1984) .................... 19

*In re Caterpillar, Inc.*, 43 U.S.P.Q.2d 1335 (1997)........................................................................ 15

*In re R.M. Smith, Inc.*, 734 F.2d 1482 (Fed. Cir. 1984).................................................................. 15

*Isentead v. Watson*, 157 F. Supp. 7 (D.D.C. 1957)........................................................................ 14

*Jones v. Bush*, 122 F. Supp. 2d 713 (N.D. Tex. 2000).................................................................... 9

*Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387 (S.D. Tex. 1989) ........................ 22

*KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989)...................................................... 22

*L.A. Gear, Inc. v. Thom Mcan Shoe Co.*, 988 F.2d 1117 (7th Cir. 1993) ...................................... 15

*Logan Graphic Products, Inc. v. Textus USA, Inc.*, 2003 U.S. Dist. LEXIS 7534 (N.D.
    Ill. May 5, 2003)[2] ........................................................................................................ 13, 14

*Mark Bric Display Corp. v. Joseph Struhl Co.*, 2003 U.S. Dist. LEXIS 12933
    (D.R.I. July 9, 2003)[3] .................................................................................................... 11, 12

*Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618 (5th Cir. 1985) .............. 9

---

[1] Attached at Tab 1.  Pursuant to paragraph E the Court's Order to Submit a Joint Status Report, Plaintiff is attaching
to its Brief the unpublished cases cited therein.
[2] Attached at Tab 2.
[3] Attached at Tab 3.

*Pebble Beach Co. v. Tour 18 Limited*, 155 F.3d 526 (5th Cir. 1998) ........................... 9, 10, 17, 19

*Pro Harware, Inc. v. Home Centers of Am., Inc.*, 6407 F. Supp. 146 (S.D. Tex. 1984) ........ 22, 23

*Racetrac Petroleum v. J.J.'s Fast Stop*, 2003 U.S. Dist. LEXIS 1569 (N.D. Tex. Feb. 3, 2003)[4] 11

*Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, 2001 U.S. Dist. LEXIS 6650, 2001 WL
    540213 (N.D. Tex. May 17, 2001)[5] ............................................................. 21, 22, 23

*Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417 (5th Cir. 1984) ................................ 16

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001) ................................ 10, 13

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ......................................... 17

*Urgent Gear, Inc. v. Savoia*, 2001 U.S. Dist. LEXIS 20459 (N.D. Tex. December
    10, 2001)[6] ...................................................................................... 20, 21

*W.T. Rogers Co. v. Keene*, 778 F.2d 334 (7th Cir. 1985) ............................................. 15

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000) ................................... 9

*Westcherer Media Co., L.P. v. PRL USA Holdings, Inc.*, 103 F. Supp. 2d 935 (S.D. Tex. 1999),
    *judgment aff'd in part, vacated in part on other grounds*, 214 F.3d 658 (5th Cir. 2000) ......... 21

## Statutes

15 U.S.C. § 1051 ................................................................................ 1

35 U.S.C. § 101 ................................................................................ 14

35 U.S.C. § 171 ................................................................................ 14

15 U.S.C. § 1052(f) ............................................................................. 17

---

[4] Attached at Tab 4.
[5] Attached at Tab 5.
[6] Attached at Tab 6.

## INTRODUCTION

Plaintiff, Kodiak Products Co., Inc. ("Kodiak"), respectfully submits this Memorandum of Law in Support of its Motion for Preliminary Injunction seeking to enjoin Defendant Tie Down, Inc. ("Tie Down") from infringing upon the trade dress associated with Kodiak's hydraulic disc brake caliper.

## PRELIMINARY STATEMENT

This is an action for, among other things, violations of the Lanham Act, 15 U.S.C. § 1051, et seq. Defendant Tie Down is currently marketing an exact copy of Plaintiff Kodiak's hydraulic disc brake caliper for use with recreational trailers, whose design through the years has become uniquely associated with Kodiak. Tie Down's actions are precisely the type of activity the Lanham Act prevents. By unlawfully exploiting Kodiak's trade dress, Tie Down is causing Kodiak to suffer irreparable harm through the loss of control over its most valued asset – its good will and reputation. Accordingly, a preliminary injunction is not only appropriate, but essential to protect Kodiak's valuable rights.

## PRELIMINARY INJUNCTION EVIDENCE

In support of its Motion for Preliminary Injunction, Kodiak has contemporaneously filed its Appendix in Support of Motion for Preliminary Injunction ("P.'s App."), which includes the Declarations of William Glidewell (the "Glidewell Decl.") at Tab 1; Roger Trichler (the "Trichler Decl.") at Tab 2; Paul Shively (the "Shively Decl.") at Tab 3; Berhardt Goettker (the "Goettker Decl.') at Tab 4; and Ed J. Rackleff (the "Rackleff Decl.") at Tab 5.

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 1**

## STATEMENT OF FACTS

**A.    Kodiak's Trade Dress**

Over the past five to ten years, the vehicular trailer brake industry has seen significant changes. (Glidewell Decl. ¶ 10 at P.'s App. p. 3.) Following the lead of the automotive industry, the trailer industry has begun to gradually shift from the use of drum brakes to the use of hydraulic disc brakes. *Id.* The change is largely due to the ease of maintenance and longer life span associated with disc brakes. *Id.* The superiority of the disc brake has added benefit in the area of marine boat trailers. Because a disc brake has fewer moving parts than a drum brake, it has a higher resistance to the corrosive effects of the harsh, salt-water environment. *Id.*

Kodiak Components, Inc. ("KCI"), the predecessor in interest to Kodiak, was established in 1994 as a designer and manufacturer of products and component parts for the recreational trailer industry, including disc brakes. (Glidewell Decl. ¶ 4 at P.'s App. p. 2.) While its product range has varied greatly over the years, its main focus has been on developing and marketing its hydraulic disc brake products to original equipment manufacturers ("OEMs") and trailer parts distributors. (Glidewell Decl. ¶ 6 at P.'s App. p. 3.)

KCI's first disc brake products were reconditioned automotive disc brake calipers redesigned for use with recreational trailers. (Glidewell Decl. ¶ 4 at P.'s App. p. 2.) However, in 1994, KCI began designing a hydraulic disc brake for use exclusively with trailers. (Glidewell Decl. ¶ 5 at P.'s App. p. 2.) The goal was to provide a "new," rather than reconditioned, product to trailer manufacturers that was designed specifically for the trailer industry's unique applications. *Id.*

KCI's efforts resulted in the creation of the brake caliper now known as the Kodiak 225. (Glidewell Decl. ¶ 5 at P.'s App. p. 2.) Roughly based upon an automotive brake caliper, the Kodiak 225 is designed for use with trailers with axle weight ratings of 3500 to 6000 lbs.

(Glidewell Decl. ¶ 7 at P.'s App. p. 3.)  The Kodiak 225 is now the flagship of an entire line of brakes that include the Kodiak 250 designed for use with trailers with axle weight ratings of 7000 to 8000 lbs. and the Kodiak 338 for use with trailers with axle weight ratings of 9,000 to 10,000 lbs. *Id.* True and correct copies of photographs depicting the Kodiak 225 are attached as Exhibit "A" to the Glidewell Decl. at P.'s App. p. 8-9 and reproduced below.

The following non-functional components of the Kodiak 225 are Kodiak's trade dress and worthy of protection:

 

1) The shape and color of the caliper;
2) The width, depth and thickness of the casting;
3) The width of the casting between the two guide bolt holes (See Photo 1 above);
4) The appearance of the triangular formation of the interchangeable bleed screw, plug and brake fluid intake fittings surrounding the circular piston housing on the inboard side of the caliper (See Photo 1 above);
5) The two rectangular shaped gussets or ridges extending from the piston housing to the guide bolt holes on the inboard side of the caliper (See Photo 1 above);
6) The triangular shaped gussets or ridges extending from the guide bolt holes to the top of the caliper on the inboard side of the caliper (See Photo 1 above);
7) The symmetrical shape of the two tapered gussets or ridges on the outboard side of the caliper opposite the piston housing (See Photo 2 above);
8) The rectangular shape of the top of the casting, together with the size and rectangular shape of the opening in the top of the casting (not shown); and
9) The overall appearance of the combination and configuration of all of these elements.

(Glidewell Decl. ¶ 12 at P.'s App. p. 3-4.)

Since its entry into the trailer hydraulic disc brake market, Kodiak has seen unprecedented success. The design of the Kodiak 225 has become widely recognizable and well known in the trailer industry. (Glidewell Decl. ¶ 15 at P.'s App. p. 4; Treichler Decl. ¶ 6 at P.'s App. p. 29; Shively Decl. ¶ 4 at P.'s App. p. 31; Goettker Decl. ¶ 5 at P.'s App. p. 34; Rackleff Decl. ¶ 4 at P.'s App. p. 37.) Kodiak's market share in the marine trailer industry has grown by approximately 15 to 20% per year and in 2003 it recorded over $2.5 million in sales and sold over 50,000 units. (Glidewell Decl. ¶ 9 at P.'s App. p. 3.) In fact, while the overall market for boat trailers has decreased over the past few years, Kodiak's market share continues to increase. *Id.* Kodiak expects this success to continue as the recreational trailer industry continues its shift to the use of hydraulic disc brakes. *Id.*

**B.  Tie Down's Infringing Use of Kodiak's Trade Dress**

Six or seven years ago, Defendant Tie Down also sought to enter the hydraulic trailer brake market. (Glidewell Decl. ¶ 17 at P.'s App. p. 4; Shively Decl. ¶ 5 at P.'s App. p. 31.) It is a direct competitor of Kodiak's and sells to OEMs and through distributors throughout the country. (Glidewell Decl. ¶ 18 at P.'s App. p. 5.)

Tie Down's attempts to design a disc brake began with its "G" series "Stainless Steel Disc Brakes." (Glidewell Decl. ¶ 17 at P.'s App. p. 4; Treichler Decl. ¶ 5 at P.'s App. p. 28.) This design series consisted of a dual piston aluminum caliper over a solid stainless steel rotor. (Glidewell Decl. ¶ 17 at P.'s App. p. 4; Shively Decl. ¶ 5 at P.'s App. p. 31.) The design has proven to be inferior and has a poor reputation in the industry. (Glidewell Decl. ¶ 17 at P.'s App. p. 4; Treichler Decl. ¶ 5 at P.'s App. p. 28-29; Shively Decl. ¶ 5 at P.'s App. p. 31; Goettker Decl. ¶ 6 at Pl.'s App. p. 34-35; Rackleff Decl. ¶ 6 at Pl.'s App. p. 37.) In fact, because of its problems, Tie Down has implemented major design changes in the product almost every year. (Glidewell Decl. ¶ 17 at P.'s App. p. 4; Goettker Decl. ¶ 6 at P.'s App. 34-35.) A true and

correct copy of a photograph of Tie Down's old G-4 Series brake is attached as Exhibit "D" to the Glidewell Decl at P.'s App. p. 16.

Recently, Kodiak discovered that Tie Down was selling a replica of Kodiak's brake. Through a Tie Down customer, Kodiak obtained a Tie Down Engineering 26250 caliper ("Tie Down 26250"). (Glidewell Decl. ¶ 20 at P.'s App. p. 5.) The Tie Down 26250 is a near exact duplicate of the Kodiak 225. *Id.* True and correct copies of photographs depicting the Tie Down 26250 are attached as Exhibit "E" to the Glidewell Decl. at P.'s App. p. 18-19 and are reproduced below.

 

In addition to a similar color and overall appearance, other nonfunctional aspects of the design have been copied. It is nearly exact in size. The length of the outboard side of the Kodiak 225 measures 7.020 inches. (Glidewell Decl. ¶ 21 at P.'s App. p. 5.) The Tie Down 26250 measures 7.160 inches. *Id.* The inboard side of the Kodiak caliper is 5.90 inches, the Tie Down caliper is 5.870 inches. *Id.* The depth of the Kodiak brake measures 4.913 inches and the Tie Down brake measures 4.925 inches. *Id.* Center to center of the mounting bolt hole of both calipers measures 5.8 inches. *Id.* In addition, as can be seen from the photograph attached as

Exhibit "F" to the Glidewell Decl. at P.'s App. p. 21 and reproduced below, when sitting side by side, the Tie Down brake caliper is a near duplicate of Kodiak's.



After filing this suit Kodiak learned that Tie Down is now marketing a second similarly designed caliper, the Tie Down Engineering 46304 ("Tie Down 46304"). (Glidewell Decl. ¶ 23 at P.'s App. p. 5.)  Tie Down has made minor changes to its original infringing design and the Tie Down 46304 is made from aluminum rather than cast iron.  *Id.*  However, it is still nearly the same size and shape of the Kodiak 225 and many of the specific design elements identified with Kodiak's product remain, especially on the inboard side of the caliper.  *Id.*  The Tie Down 46304 retains the triangular formation of the fittings surrounding the circular piston housing and the gussets or ridges extending from the piston housing to the guide bolt holes.  *Id.*  True and correct copies of photographs depicting the Tie Down 46304 are attached as Exhibit "G" to the Glidewell Decl. at P.'s App. p. 23-24 and reproduced below.



The triangular design of the fitting surrounding the piston housing on the inboard side of Kodiak's caliper is what the company is most noted for in the industry and what serves to distinguish it from the other calipers on the market (Glidewell Decl. ¶ 14-15 at P.'s App. 4; Goettker Decl. ¶ 5 at Pl.'s App. p. 34; Rackleff Decl. ¶ 4 at Pl.'s App. p. 37). In fact, as reflected in the true and correct copies of photographs attached as Exhibit "H" to the Glidewell Decl. at P.'s App. 26 of the Kodiak 225 and Tie Down 26250 mounted to trailer axle, this design is the most notable characteristic on the inboard side of the wheel. Clearly Tie Down's new design also seeks to duplicate the overall outward appearance of Kodiak's design.

While Tie Down appears to have gone to great lengths to copy size, shape, configuration and color of the Kodiak 225, mechanical aspects of the Tie Down 26250 are of a lower quality. (Glidewell Decl. ¶ 24 at P.'s App. p. 5.) The confusion that is likely to result between the products, therefore, will reflect badly on the image Kodiak has developed with its higher quality product. One example of the lower quality design of the Tie Down 26250 brake is the guide bolt connection that attaches the caliper to the mounting bracket. *Id.* Kodiak utilizes a guide bolt and guide bolt sleeve inside a rubber bushing. *Id.* Kodiak's design minimizes chances for overstress on the guide bolt and provides an automotive quality connection. *Id.* The Tie Down 26250

utilizes a simple shoulder bolt in a brass sleeve.  *Id.* Tie Down's design was utilized by the automotive industry very briefly in years past, but it was quickly abandoned because the stress on the guide bolt created a tendency for the bolt to fail or loosen.  *Id.*

Clearly, Kodiak has no control over the quality of the copy of its product sold by Tie Down.  While part of Kodiak's success is due to the shift in the trailer market to the use of disc brakes, another reason is the quality of the mechanical aspects of its product.  (Glidewell Decl. ¶ 11 at P.'s App. p. 3.)  A brake caliper's general function is to provide a mechanism to force the brake pads against the rotor, causing friction against the rotor that in turn slows the vehicle. (Glidewell Decl. ¶ 13 at P.'s App. p. 4.) This is accomplished by forcing pressurized brake fluid into the piston housing, moving the piston, thus causing the disc pads to "squeeze" the rotor.  *Id.* Kodiak's reputation is based upon its use of the highest quality parts and its manufacturing in accordance with strict engineering specifications in order to achieve this result.  *Id.* Kodiak, however, does not seek to protect these functional features of the product, but rather the outward appearance of the caliper that has become uniquely associated with the company and that is an industry-wide symbol of the good will that Kodiak now enjoys.  To protect itself from the immeasurable damages to its reputation that will occur from Tie Down's sale of infringing products, and to alleviate the irreparable harm that is inevitable, Kodiak commenced this action.

## ARGUMENT

### KODIAK IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING TIE DOWN'S USE OF KODIAK'S PROTECTED TRADE DRESS

It is well settled in this Circuit that a plaintiff is entitled to a preliminary injunction upon showing: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant,

and (4) that granting the preliminary injunction will not disserve the public interest. *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *Jones v. Bush*, 122 F. Supp. 2d 713, 718 (N.D. Tex. 2000).

As set forth below, Kodiak .meets these requirements and is clearly entitled to a preliminary injunction.

**A.     Kodiak Has A Substantial Likelihood Of Prevailing On Its Trade Dress Infringement Claim**

The applicable law and the facts of the case determine the likelihood of success on the merits. *See Mississippi Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 622 (5th Cir. 1985). In order to establish a likelihood of success on the merits of a trade dress infringement claim, a plaintiff must show: 1) the trade dress qualifies for protection; and 2) there exists likelihood of confusion between the trade dress of the alleged infringer and the plaintiff. *See Pebble Beach Co. v. Tour 18 Limited*, 155 F.3d 526, 536 (5th Cir. 1998). Kodiak can clearly satisfy both theses elements.

*1.*     **The Kodiak 225 Qualifies For Protection Because Aspects Of Its Design Are Nonfunctional And Have Acquired Secondary Meaning**

In order to be show a product's design qualifies for trade dress protection under the Lanham Act, a plaintiff must generally show its trade dress 1) is not functional, and 2) has acquired secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000); *Allied Mktg. Group, Inc. v. CDL Mktg. Group*, 878 F.2d 806, 813 (5th Cir. 1989).

**a.     Kodiak's Trade Dress Is Nonfunctional**

The Lanham Act protects only nonfunctional distinctive, trade dress. *See Pebble Beach Co. v. Tour 18 Ltd.,* 155 F.3d 526, 537 (5th Cir. 1998). As set forth in *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002), the Fifth Circuit employs two distinct tests for the determination of functionality of specific features. First, a product feature is functional if

it is essential to the use or purpose of the article or it affects the cost or quality of the article (the "traditional test"). *Id.* at 355. Under this test, the availability of alternative designs of the specific features is irrelevant. *Id.* The adoption by the Fifth Circuit of the "traditional test" is based upon the recent Supreme Court decision in *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). A second test finds that a feature is functional if its protection would place competitors at a significant non-reputation-related disadvantage (the "competitive necessity test"). *Eppendorf*, 289 F.3d at 356.

> (i)    Kodiak's Trade Dress is Non-Functional Under the Traditional Test.

In addition to specific features contained within a product, trade dress also may consist of the overall appearance of the combination of all of its features.

> A collection of functional features in a product design does not necessarily make the combination of those features functional and therefore unprotectible. Where the trade dress of a product consists of a particular configuration of features, the functionality of the design turns on whether its design as a whole is superior to other designs, not on whether its component features viewed individually each have a function.

*Pebble Beach*, 155 F.3d at 538 (internal quotation marks and citations omitted). Thus, even if certain isolated features of the Kodiak 225 are somehow functional, such a determination is not dispositive.

The availability of trade dress protection for the overall appearance of a collection of functional features has never been questioned in this Circuit. The principal was not an issue in either *TrafFix* or *Eppendorf.* In *TrafFix*, the plaintiff sought trade dress protection for a single element of its product – the design of the dual spring mechanism used in its sign. *See TrafFix*, 532 U.S. at 26, 30. In *Eppendorf*, the plaintiff sought protection for eight separate and distinct features of its pipetee tips and dispenser syringes. *See Eppendorf*, 289 F.3d at 353. In neither

case did the plaintiff seek protection of the overall look of its product nor the appearance of the combination of the products' features, but instead sought protection for specific features associated with the product.

Several courts have recognized that an overall appearance of a product can qualify for trade dress protection post-*TrafFix*. *See Coach, Inc. v. We Care Trading Co.*, 2002 U.S. App. LEXIS 28143 *7 (2d Cir. May 20, 2002) (summary order) ("Even if individual elements of a trade dress are functional, their arrangement or combination may be 'arbitrary, fanciful, or suggestive' and thus deserve trade dress protection"); *Mark Bric Display Corp. v. Joseph Struhl Co.*, 2003 U.S. Dist. LEXIS 12933 (D.R.I. July 9, 2003); *Racetrac Petroleum v. J.J.'s Fast Stop*, 2003 U.S. Dist. LEXIS 1569 *43 (N.D. Tex. Feb. 3, 2003) (quoting *Pebble Beach*) ("'A collection of functional features in a product design does not necessarily make the combination of those features functional.'").

In *Mark Bric Display Corp. v. Joseph Struhl Co.*, the plaintiff sought trade dress protection for the overall design and appearance of plastic frame and graphics display products for point-of-sale advertising, in store advertising, and trade show exhibits. 2003 U.S. Dist. LEXIS 12933 *4, 18. The defendant, a manufacturer of a product with a very similar outward appearance to that of the plaintiff's, attacked each element of the plaintiff's claimed trade dress as functional. *Id.* *18. The District Court for the District of Rhode Island analyzed these attacks under the exact two-step method adopted by the Fifth Circuit in *Eppendorf* and found the plaintiff met the requirements of both tests. *Id.* *17-20. In making its analysis under the "traditional" test, the court identified one feature as clearly functional, but stated "[o]ne functional feature, however, does not make the complete designation functional when the combination of features is non-functional." *Id.* *19.

The overall appearance and combination of each of the design features of the Kodiak 225 are non-functional under the traditional test. Unlike the plaintiffs in *TrafFix* and *Eppendorf,* Kodiak does not seek protection for any of the mechanisms associated with a brake caliper's essential function. Kodiak seeks protection for the overall appearance of the brake caliper casting, the design of which is not essential for its function nor significantly affects its cost or quality.

A nonfunctional combination of functional features is no more evident than in Kodiak's use of the triangular design of the interchangeable bleed screw, plug and brake fluid intake fittings. (*See* Exhibit A to Glidewell Decl. at 8 and photo reproduced, *supra*, p. 4.) Every hydraulic brake requires a bleed screw and a fluid intake. (*See* Glidewell Decl. ¶ 14 at P.'s App. p. 4.) However, the placement of these features in a triangular formation surrounding the piston housing is not the "reason the device works" and does not affect its cost or quality. *Id.* The placement of these features was arbitrary and could have been combined in a variety of ways, without an effect on the ability of other brake manufacturers to compete. *Id.* For instance, with the Kodiak 225, the bleed screw, plug and fluid intake fittings extrude from the side of the piston housing. Tie Down could have designed its caliper with these fittings extruding from the face of the piston housing rather than the side. In fact, many brake designs for use with automobiles utilize this design. *Id.* A true and correct photograph of an example of a caliper with such a design is attached as Exhibit "B" to the Glidewell Decl. at P.'s App. p. 11 and reproduced below. Furthermore, the placement and angle of these fittings could have been designed differently with out affecting the usefulness of the functional design. (*See* Glidewell Decl. ¶ 14 at P.'s App. p. 4.)



The issue in *TrafFix*, which led to the adoption of the traditional test in the Fifth Circuit, was what effect the existence of an expired utility patent had on a trade dress claim seeking protection for the exact mechanism covered by an expired utility patent, specifically the dual spring design of road signs. *TrafFix Devises*, 532 U.S. at 26-28. The Court concluded that the existence of a prior utility patent had vital significance:

> A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. *Where the expired patent claimed the features in question*, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

*Id. (emphasis applied).* In the absence of the existence of a utility patent covering the specific feature for which trade dress protection is sought, *TrafFix* and its implied presumptions of functionality have limited application.

In analyzing *TrafFix*, one court has concluded that where the features claimed as trade dress are not the subject of a utility patent, the principals announced in *Traffix* do not even apply. *Logan Graphic Products, Inc. v. Textus USA, Inc.*, 2003 U.S. Dist. LEXIS 7534 *10 (N.D. Ill. May 5, 2003). In *Logan Graphic Products*, the product at issue was a mat-cutting tool. *Id.* *2.

The plaintiff sought protection for the overall look of its product. *Id.* *3. The defendant claimed that the product was not entitled to trade dress protection, arguing that the alleged unique and non-functional components of the product were the subject of two expired utility patents held by the plaintiff. *Id.* *4. The plaintiff, however, presented evidence that the patents did not cover the features at issue in the case. *Id.* *9. The District Court for the Northern District of Illinois stated, "Because the *TrafFix* decision dealt with trade dress protection sought for the exact mechanism covered by an expired utility patent, and because the features sought to be protected here are not covered by expired patents, the *TrafFix* decision is not controlling." *Id.* *10. The court determined, considering alternative competitor's designs, that the plaintiff had met its burden under a competitive necessity test and granted a preliminary injunction. *Id.* *11-13, 19-20. Kodiak does not hold, expired or otherwise, a utility patent with respect to any of the features of its brake caliper.

Even if the *TrafFix* holding extends to situations were utility patents *might* be available, it is unlikely Kodiak could have acquired a utility patent protecting the shape, configuration and size of the caliper itself. Utility patents protect "new and useful" items. 35 U.S.C. § 101. "In other words, there must be both novelty and utility as a basis for the granting of a patent. 'Utility' is a broad term and implies among other things the capacity to perform the function or to attain the result claimed by the applicant in his disclosure." *Isentead v. Watson*, 157 F. Supp. 7, 9 (D.D.C. 1957).

Conversely, a design patent may be "obtained for the ornamental design of an article of manufacture." 35 U.S.C. § 171. Thus, a design patent is directed to the appearance of a product. *See L.A. Gear, Inc. v. Thom Mcan Shoe Co.*, 988 F.2d 1117, 1123 (7th Cir. 1993). If a design is functional, it does not qualify for protection under a design patent. *See id.*

Unlike utility patents, there exists some over lap in the protections afforded by design patents and trade dress, such that the availability of a design patent does not foreclose trade dress protection in a product's design. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 154 (1988) ("Trade dress is, of course, potentially the subject of design patents.") (citing *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 337 (7th Cir. 1985) (holding that the existence of a design patent "does not prevent the enforcement of a common law trademark in a design feature")). The distinction, and the basis for the indefinite protection provided under trademark law, is that an owner must prove secondary meaning and likelihood of confusion in a trademark infringement suit that a design patent owner need not show. *W.T. Rogers*, 778 F.2d at 337. For these reasons, the existence (or availability) of a design patent is some evidence of non-functionality. *See In re Caterpillar, Inc.*, 43 U.S.P.Q.2d 1335 (1997).

While Kodiak has never applied for a design patent, such patents are generally available for the design of brake calipers. The United States Patent and Trademark Office has issued a number a disc brake caliper design patents, including U.S. Patent No. D462,040 S, attached at P.'s App. p. 40-44. The claim associated with this patent is the "ornamental design" of the caliper body. (P.'s App. p. 40.)

The availability of a design patent for Kodiak's brake caliper is of vital significance. However, the fact that a product is or was the subject of a design patent does not, without more, establish that a product's design is protectable trade dress. *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1485 (Fed. Cir. 1984). In addition to the availability of a design patent, however, Kodiak has established that its product has acquired secondary meaning (See A.(1)(b) below) and has met the requirements of the "competitive necessity test."

(ii)   <u>Kodiak's Trade Dress Is Non-Functional Under the Competitive Necessity Test</u>

The Fifth Circuit has equated the competitive necessity test established in *TrafFix* with the "utilitarian" test formerly exclusively used in the Fifth Circuit to determine whether a product feature was functional. *See Eppendorf*, 289 F.3d at 356. Under this test a feature is functional if characterizing the feature as protected will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods. *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 429 (5th Cir. 1984). A product feature may serve certain functions, but a design is not rendered legally functional unless the design is only one of a limited number of equally efficient options and protecting the design would unduly hinder free competition. *Id.*

Unlike the traditional test for functionality where the availability of alternative designs may be irrelevant, such evidence is important under the utilitarian or competitive necessity test. As can be seen from Tie Down's G-4 brake, other designs are clearly available. (*See* Exhibit D to the Glidewell Decl. at P.'s App. p. 16) Another example of alternative designs of trailer brake calipers are the ones marketed by Unique Functional Products, photographs of which are attached to the Glidewell Decl. as Exhibit "C" at P.'s App. p. 13-14. Each of these brakes function similarly to the Kodiak 225 (i.e. providing a mechanism to squeeze the rotor and slow the vehicle); however, each has its own unique look. The clear availability of alternative designs strongly supports a finding of non-functionality. Tie Down's only purpose in mimicking Kodiak's design is to attempt to trade on the good will that Kodiak has developed over the years.

**b.     The Design of the Kodiak 225 Has Acquired Secondary Meaning**

Secondary meaning is a term used to indicate that trade dress "has come through use to be uniquely associated with a specific source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767 n.4 (1992) (quoting Restatement (Third) of Unfair Competition § 13, Comment e (Ten. Draft No. 2, Mar. 23, 1990)).   To establish secondary meaning, a defendant must show that, in the minds of the public, the primary significance of a product feature is to identify the source of the product, rather than the product itself. *Id.*

In the Fifth Circuit, secondary meaning can be proven by a consideration of the following evidence:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising,  (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach Co.*, 155 F.3d at 541.   "While each of these types of evidence alone may not prove secondary meaning, in combination they may indicate that consumers consider the . . . trade dress to be an indicator of source." *Id.*   A multiplicity of these factors favors a finding that the Kodiak 225 has acquired the requisite secondary meaning.

Kodiak has continuously and exclusively sold the Kodiak 225 for nearly ten (10) years. (Glidewell Decl. ¶ 5 at P.'s App. p. 2.)   While during this period other companies have sold hydraulic disc brakes for use with trailers, until the Tie Down 26250 and the Tie Down 46304, no others shared the unique features of Kodiak's design. (Glidewell Decl. ¶ 20 at P.'s App. p. 5; Goettker Decl. ¶ 5 at Pl.'s App. p. 34.)   For the purpose of determining secondary meaning for federal registration, a five year exclusive use of a mark or dress results in a presumption of secondary meaning. *See* 15 U.S.C. § 1052(f).

Kodiak can also show a high volume of sales. Over the ten-year period since Kodiak developed its product, it has registered substantial sales. Last year it sold over 50,000 units and recorded over $2.5 million in sales. (Glidewell Decl. ¶ 9 at P.'s App. p. 3.) These figures reflect an approximate 35% share of the market. *Id.*

Extensive advertising is not a customary practice in the trailer component part market. (Glidewell Decl. ¶ 19 at P.'s App. p. 5.) While Kodiak has not engaged in excessive advertising of its product, it has appeared in advertisements in trade magazines and brochures distributed at trade shows. *Id.* It also maintains a website, www.kodiaktrailers.com, which contains extensive information concerning the Kodiak 225, as well as other products. *Id.*

Kodiak has not, at this juncture of the case, completed its customer survey. "There is no requirement that survey evidence be presented at the preliminary injunction stage." *Artemide Spa v. Grandlite Design & Mfg. Co.*, 672 F. Supp. 698, 709 (S.D.N.Y. 1989)

While not yet compiling a complete customer survey, Kodiak has direct customer evidence of secondary meaning in the form of Declarations from Paul Shively and Roger Treichler, both experienced trailer component purchasers. Kodiak also has direct testimony establishing secondary meaning from competitors of both Tie Down and Kodiak in the form of Declarations from Bernhardt Goettker and Ed J. Rackleff. As this testimony clearly establishes, the design of the Kodiak 225 has developed through its use a unique association with Kodiak, and thus, has acquired secondary meaning. (Triechler Decl. ¶ 6 at P.'s App. p. 29; Shively Decl. ¶ 4 at P.'s App. p. 31; Goettker Decl. ¶ 5 at P.'s App. p. 34; Rackleff Decl. ¶ 4 at P.'s App. p. 37.)

Finally, because of the near identical design of the Tie Down's brake calipers, there can be no doubt that Tie Down intended to copy Kodiak's brake design. Nearly every feature present in Kodiak's caliper has been incorporated into Tie Down's design.

### 2. A Strong Likelihood of Confusion Arises From Tie Down's Sale of a Copy of Kodiak's Brake Caliper

The essence of a trade dress infringement claim is whether the alleged infringer's use creates a likelihood of confusion as to the source, affiliation, or sponsorship of the plaintiff's dress. *See Pebble Beach Co.*, 155 F.3d at 543. Likelihood of confusion is synonymous with a probability of confusion, which is more that a mere possibility. *Id.* In determining whether a likelihood of confusion exists, the Fifth Circuit considers the following nonexhaustive list of factors:

> (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion.

*Id.* However, "[n]o single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these 'digits of confusion.'" *Id.*

Types of trademarks or trade dress are classified into the following categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *See Pebble Beach*, 155 F.3d at 540. While once conceived as distinct categories, the classifications are now commonly viewed as "central tones in a spectrum," with the strength of the mark or dress and its protection increasing as one moves away from generic and descriptive marks toward arbitrary marks. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir. 1984). "While most elements of design--that is, colors, shapes, placement of marks on the package, etc.--can independently be called 'arbitrary,' no seller can foreclose others absolutely from using any particular color or other feature." *Id.*

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 19**

Kodiak's trade dress reflects arbitrary and specific design elements that go beyond the use of a particular color, shape, etc., and thus approaches an arbitrary distinction. *See, e.g., Urgent Gear, Inc. v. Savoia*, 2001 U.S. Dist. LEXIS 20459 *8-9 (N.D. Tex. December 10, 2001) Specifically the use of the trilateral look of its interchangeable brass bleed screw, plug and brake fluid intake fittings is unique to Kodiak and has been associated with its product since 1994.

The similarity of the products is unquestionable. The overall designs are almost identical. Except for incredibly minor design differences, the color, configuration and shape are the same.

Kodiak and Tie Down market to the same customers. (Glidewell Decl. ¶ 18 at P.'s App. p. 5.) Both market to OEMs located throughout the United States. *Id.* In fact, Kodiak first learned of Tie Down's infringing use of its trade dress through one of its customers to whom Tie Down had attempted to sell the infringing product. (Glidewell Decl. ¶ 20 at P.'s App. p. 5.)

Kodiak and Tie Down also utilize similar advertising media. Both companies have web sites that promote their products, advertise in trade magazines and participate in trade shows. (Glidewell Decl. ¶ 19 at P.'s App. p. 5.)

As indicated above, there can be no question that Tie Down intended to copy Kodiak's design trade dress. A defendant's adoption of a plaintiff' trade dress with the intent to derive a benefit from the plaintiff's reputation may alone be sufficient to justify the inference that there is confusing similarity. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980). Tie Down has not only copied Kodiak's design, it has marketed the brake caliper as an exact duplicate of Kodiak's. (Glidewell Decl. ¶ 20 at P.'s App. p. 5.)

Finally, there is strong evidence of actual confusion. Specifically, when Mr. Shively, an experienced marketing manager for a trailer part distributor, first saw the Tie Down 26250, he

thought it was Kodiak's brake. (Shively Decl. ¶ 7 at P.'s App. p. 32.) Mr. Treichler, who has been in the trailer component business for thirty years, indicates there is no doubt the products are confusingly similar. (Treichler ¶ 7 at P.'s App. p. 29.) Both Mr. Goettker and Mr. Rackleff, when they saw the Tie Down brake caliper, thought it was Kodiak's. (Goettker Decl. ¶ 7 at Pl.'s App. p. 35; Rackleff Decl. ¶ 7 at Pl.'s App. p. 38.) Even after a closer inspection of the brakes revealed Tie Down markings, each believed that, because of the similarity of the design, that there was a sponsorship or affiliation by Kodiak of the Tie Down Product. (Goettker Decl. ¶ 8 at Pl.'s App. p. 35; Rackleff Decl. ¶ 8 at Pl.'s App. p. 38.). This direct testimony of actual confusion is likely alone sufficient to establish a likelihood of confusion.

**B.      Kodiak Will Suffer Irreparable Injury If The Injunctive Relief Sought Is Not Granted.**

If Tie Down is allowed to continue to market and sell its copy of the Kodiak brake, Kodiak will suffer irreparable harm by losing control over one of its most valuable assets, its good will and reputation. *See Westcherer Media Co., L.P. v. PRL USA Holdings, Inc.*, 103 F. Supp. 2d 935 (S.D. Tex. 1999), *judgment aff'd in part, vacated in part on other grounds*, 214 F.3d 658 (5th Cir. 2000) (granting injunctive relief and finding that plaintiff will suffer irreparable harm where it "does not have the ability to control its own reputation and good will"). Specially, Kodiak has no control of the quality of the Tie Down brake and its reputation and good will developed over the years resulting from the production of a quality product is at the mercy of Tie Down.

The strong likelihood of confusion created in this case also reflects the probable irreparable injury Kodiak will suffer if Tie Down is not enjoined. *See Urgent Gear,* 2001 U.S. Dist. LEXIS 20459 *15; *see also Ramada Franchise Sys., Inc. v. Jacobcart, Inc.*, 2001 U.S. Dist. LEXIS 6650, 2001 WL 540213 *3 (N.D. Tex. May 17, 2001) ("In a trademark infringement

case, 'a substantial likelihood of confusion constitutes irreparable injury.'") (quoting *KFC Corp.*
*v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989)); *Joy Mfg. Co. v. CGM Valve & Gauge Co.*,
730 F. Supp. 1387, 1394 (S.D. Tex. 1989) ("When a likelihood of confusion exists, the plaintiff's
lack of control over the quality of the defendant's goods constitutes immediate and irreparable
harm, regardless of the actual quality of the defendant's goods.").

**C.    The Potential Harm To Tie Down If The Injunction Is Granted Is Minimal
Compared To The Harm Kodiak Will Suffer From Tie Down's Infringing Use of
Kodiak's Dress.**

Tie Down's only potential harm is that of lost sales revenue from a new product. Upon
information and belief, Tie Down has only recently begun marketing its clone brakes. Its brake
sales are therefore likely minimal when compared to Kodiak's, which have been developed from
years of investment of time and money. Tie Down has no right to reap any profits from
Kodiak's successful efforts.

Even if Tie Down does sustain some incidental loss, any loss would be the result from its
own wrongdoing. Any claim that Tie Down will suffer harm if injunctive relief is granted
"merits like equitable consideration in light of" Tie Down's willful infringing conduct. *See Pro
Harware, Inc. v. Home Centers of Am., Inc.*, 6407 F. Supp. 146, 154 (S.D. Tex. 1984). The only
harm to Tie Down will be loss of sales from an infringing product. Although defendants suffer
some amount of harm in such situations, "courts usually hold that when defendants improperly
use a plaintiff's [trade dress], the threatened harm to the plaintiff outweighs the threatened harm
to the defendants." *Ramada Franchise Sys.*, 2001 U.S. Dist. LEXIS 6650 *10.

**D.    An Injunction Will Not Disserve The Public Interest.**

Finally, courts in this Circuit consistently have recognized that the "public interest is
always served by requiring compliance of statutes of Congress. This is true with respect to . . .
upholding the purposes of the Lanham Act." *Pro Hardware*, 607 F. Supp. at 155; *accord*

*Ramada Franchise Sys.*, 2001 U.S. Dist. LEXIS 6650 *10 (The public interest "promotes the protection of valuable [trade dress] in a capital-based economy that rewards success through competition."); *American Rice, Inc. v. Arkansas Rice Growers Co-op Ass'n*, 532 F. Supp. 1376, 1389-90 (S.D. Tex. 1982), *judgment aff'd* 701 F.2d 408 (5th Cir. 1983) ("Consequently, the Court finds that a preliminary injunction would serve the public interest, in keeping interstate commerce . . . free from unfair competition."). Accordingly, granting a preliminary injunction could only promote, not disserve, the public interest.

## CONCLUSION

For all the foregoing reasons, Kodiak respectfully requests that this Court issue a preliminary injunction, enjoining Tie Down's sale of the Tie Down 26250, the Tie Down 46304, or a similarly designed product, pending the outcome of this litigation.

Respectfully submitted,

KESSLER & COLLINS
A Professional Corporation

By:_____
        GARY S. KESSLER
        Texas Bar No. 11358200
        BRYON L. ROMINE
        Texas Bar No. 24029804

        5950 Sherry Lane
        Suite 222
        Dallas, Texas 75225
        214.379.0722
        214.373.4714 (Facsimile)

        **ATTORNEYS FOR KODIAK
        PRODUCTS, INC.**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of *Plaintiff's Memorandum of Law in Support of Preliminary Injunction was* served via certified mail, return receipt requested on the ⎽15ᵗʰ⎽ day of March, 2004, on the following counsel of record:

> J. Alexander Porter
> Porter & Orrison, LLP
> 3400 Peachtree Rd. N.E.
> 1135 Lenox Towers
> Atlanta, Georgia 30326

GARY S. KESSLER